SCHOTT, Chief Judge.
In a collision between a van and a motorcycle on March 29, 1978, the motorcycle was thrown out of control. It struck plaintiff who was loading something into the trunk of an automobile parked nearby. Defendants, who are the owner, driver, and insurer of the van, appealed and plaintiff answered the appeal; both sides, complaining about the quantum of damages.
According to plaintiff the motorcycle struck him on his low back and the backs of his knees and ankles. He was taken to Charity Hospital for emergency treatment and, on April 14, 1978, consulted Dr. Bruce Iteld, an internist. Plaintiff was complaining of pain into his right knee, right thigh, and groin area. After examination Iteld diagnosed a groin sprain or strain and a problem with the right knee. He prescribed semi-weekly physical therapy treatments in his office.
Until October, 1979, plaintiff was under Iteld’s care, seeing him monthly and having regular therapy treatments. In the meantime, plaintiff, on June 30, 1978, consulted Dr. John Watermeier, an orthopedist, complaining about pain and weakness of his right knee. Watermeier diagnosed his condition as an internal derangement of his right knee or a chondromalacia type of injury involving the cartilage. Initial treatment consisted of injection into the knee with cortisone and a local anesthetic to relieve pain and reduce swelling. Plaintiff continued to be treated by both Iteld and Watermeier for his right knee, but there is no mention in the physicians’ records of any problem with his left knee until January 12, 1979 when Watermeier noted that he complained of pain in both knees “again”. Then on January 17 Iteld noted that “his knees” were better in contrast with previous notes which mentioned the right knee only.
In March, 1979, Watermeier performed arthroscopies on both knees and found a severe amount of chondromalacia in the right knee, a mild to moderate amount of chondromalacia in the left knee, and a fraying or tear of the meniscus in the left knee. He described chondromalacia as a degeneration of the cartilage under the patella or kneecap. Second arthroscopies performed in May, 1980, revealed a moderate amount of chondromalacia in the right knee, a mild amount in the left knee, and a meniscus tear in the left knee. Watermeier performed a meniseetomy on the left knee in July, 1980, removing the meniscus and the cartilage under the patella. Watermeier estimated a ten to fifteen percent permanent disability of the left knee. He did not rule out future surgery on the right knee, but did not think it was probable. He thought that plaintiff’s condition would deteriorate and attributed a fall plaintiff had in a supermarket in July, 1982 to his condition, explaining that persons who have surgery as plaintiff had on his left knee are susceptible to such falls.
The case was tried to a commissioner whose report was adopted by the trial judge. The court found that plaintiff suffered injury to his right knee and ankle and would have to undergo additional medical treatment and surgery in the future. The court specifically found that the evidence was insufficient to support plaintiff’s claim that he suffered injury to the left knee. The court awarded the following to plaintiff:
Past Medical Expenses $ 5,422.38
Future Medical Expenses 5,000.00
Loss of Earnings 15,000.00
General Damages 45,000.00
TOTAL $70,422.38
In their appeal, defendants contend that the trial court erred in awarding anything *425 for future medical expenses and abused its discretion in awarding $45,000 for general damages. In his answer to the appeal, plaintiff contends that the trial court erred in finding that his evidence was insufficient to prove his left knee injury was caused by the accident; in failing to compensate him adequately for loss of future earnings and diminution of future earning capacity; and in failing to award the full amount of his past medical expenses. Further, he contends that the trial court abused its discretion in the award for general damages. Finally, he seeks damages for a frivolous appeal by defendants.
The first question is whether the trial court committed manifest error in finding that the evidence did not support plaintiff’s claim of injury to his left knee. The case was tried in November, 1984, and the commissioner did not submit a report until September 5, 1986. Included in the recommended award is the fee of Dr. Louis Levy whose involvement was with the left knee only. In the report, the commissioner found that it was not until January 12, 1979 that plaintiff complained of his left knee. This is manifestly erroneous. Dr. Watermeier’s January 12 note says that plaintiff was complaining again about both knees. Watermeier interpreted the note to mean that he did complain about the left knee previously even though his and plaintiffs attention had been focused on the right knee. Watermeier testified that the plaintiffs problems with both knees were related to the accident and that, in the absence of an intervening trauma between the accident and the symptoms, he would have to assume that the accident was the cause. The record is devoid of any suggestion that he suffered such a trauma. Finally, while Watermeier acknowledged the possibility that plaintiffs chondromalacia in both knees pre-existed the accident, the evidence of plaintiffs extensive and strenuous physical activity and exercise before the accident dispels this possibility. The combination of the trial court’s error in finding that plaintiff made no complaint about his left knee until January, 1979 and in failing to evaluate properly and accurately the testimony of Dr. Watermeier on causation led the court to reach a manifestly erroneous factual conclusion. Consequently, we are compelled to adjust the award to compensate plaintiff for his left knee injury along with his other injuries.
The trial court awarded plaintiff $15,000 for loss of earnings. Plaintiff argues forcefully that he is entitled to substantial sums for lost past and future earnings. He produced an economist who concluded that plaintiff was entitled to $157,-385 for past earnings based upon an annual salary of $27,820 for the six and two-thirds years between the accident and the trial; and to $798,558 for lost future earnings based upon annual earnings of $43,714 for twenty-six years, the estimated work life of plaintiff. These projections are not supported by the evidence. At best, plaintiff’s work record was spotty before the accident. He had tried being a longshoreman, a pest control operator and a tennis instructor. The economist assumed he was doing all these things and would continue to do so. However, his actual income as reported to the Internal Revenue Service for the first quarter of 1978 was only $2,600. Except for the time when plaintiff had and was recovering from the menisectomy, he was never totally disabled. In fact, he worked at various jobs before the trial as a pest control operator, a times share real estate salesman, an insurance salesman and a siding salesman. Because of plaintiff’s failure to prove that he had earned anything more before the accident than he was earning afterwards, we are unable to conclude that the trial court erred in awarding little for loss of past earnings.
Plaintiff’s claim for loss of future earnings rests on the assumption that he would become a longshoreman and earn $54,000 annually. The record shows that plaintiff and his cousin, Ronnie, had gone on the waterfront as “rabbits” or apprentice longshoremen in 1973. Ronnie testified that one could earn a union card after working seven hundred hours per year for four years. Ronnie persevered and became a journeyman longshoreman. In the meantime, plaintiff having tried being a long *426 shoreman in 1973 never tried again until 1978. The only reasonable conclusion one can draw from this record is that he would never become a journeyman .longshoreman earning $54,000 per year. In his report, the commissioner said of plaintiff’s economist that he was not persuaded by his conclusions, his assumptions regarding plaintiff’s work history being substantially without foundation. The record supports this conclusion.
On the other hand, even though the trial court disregarded the economist’s testimony and found little support in plaintiff’s testimony for an award for loss of earnings, the court awarded him $15,000. And this was based on the erroneous conclusion that his left knee injury was not caused by the accident. Our conclusion that it was caused by the accident supports an increase in this award for several reasons.
First, the trial court considered an award for loss of earnings to be appropriate even though he found no causation for the left knee injury. Since the right knee only would have produced no permanent disability, there was no basis for the trial court to make an award for loss of future earnings. It appears that the award of $15,000 was for lost earnings incurred prior to trial while the plaintiff was undergoing treatment for and recovering from his right knee and groin injuries. On the other hand, our conclusion that the left knee injury was caused by the accident compels an award of some damages for loss of future earnings. Dr. Watermeier testified that plaintiff’s left knee problems were permanent and translated into a ten to fifteen percent disability. He thought plaintiff could never again perform work which involved bending, stooping, lifting or carrying heavy objects. He ruled out employment as a longshoreman or tennis instructor. To some extent Watermeier’s opinion was in conflict with that of Dr. Raymond Kitziger, an orthopedist who examined plaintiff on May 31, 1983 at the request of defendants.
Before discussing Kitziger’s testimony, it becomes necessary to consider plaintiff’s July, 1982 fall in a supermarket. As a result of this fall, his left knee was dislocated. He was brought to the hospital where he was immobilized in splints for six weeks and was treated by Dr. Ray Haddad, another orthopedist. Kitziger felt that on the basis of the menisectomy standing alone he would rate plaintiff’s disability at only five to ten percent and he would not rule out work involving bending, stooping and lifting. However, considering that he suffered this lateral dislocation of the patella from the fall, he should not work on heights. Consequently, Kitziger would rule out a longshoreman job for plaintiff.
Defendants’ argument that the supermarket fall was not the result of the accident sued on is not supported by the record. Watermeier testified unequivocally that the left knee problems, including the menisectomy produced a weakness in the knee and a tendency that it would “give way”. He concluded that the accident was the cause of the 1982 supermarket fall. This testimony was not contradicted.
Thus, Watermeier and Kitziger ultimately agree that plaintiff has a ten to fifteen percent disability from which we conclude that plaintiff is entitled to an award at least for diminution of earning capacity. While plaintiff failed to make out a case for loss of future earning, the fact remains that his best chance at employment was in the physical area. Before the accident he was apparently strong and physically active. His education was limited. Left with a permanent physical disability at the age of thirty-three at trial time, his ability to earn money is definitely impaired. Considering that he has been able to find other employment and will continue to do so, we conclude that an award of $25,000 for diminution of future earning capacity is appropriate.
As to general damages, the trial court awarded $45,000 which defendants contend is so excessive that it constitutes an abuse of discretion. Even considering that this award was made without regard to the left knee, we are not persuaded by defendants’ argument. But with the addition of the pain and suffering caused by *427 .the left knee and the supermarket fall, we find merit to plaintiff’s argument that the award is inadequate. Plaintiff has been subjected to two arthroscopies and one surgical procedure. Additionally, the supermarket fall resulted in a dislocated left knee requiring plaintiff to wear a splint for six weeks. He was under the care of physicians until January, 1984, almost six years after the accident. His whole life style was altered at the age of twenty-six. He regularly engaged in tennis, horse-back riding, jogging and other sports before the accident, and his ability to do these things now is seriously impaired. In effect, he is left with a permanent handicap from the accident. We have concluded that the trial court’s award for this item should be increased by $25,000.
Defendants’ argument that plaintiff is not entitled to an award for future medical expenses has merit. Dr. Watermeier last saw plaintiff in January, 1984, ten months before the trial. Although he thought that plaintiff’s condition would deteriorate he did not think further surgery was probable. Furthermore, he did not express any opinion as to specific future treatments which would provide a basis for an award for future medicals. Since there is no proof for this item, we have concluded that it must be deleted from the judgment.
The trial court award of $5,422.38 for special medical expenses is incomplete and must be increased to include those ■ expenses associated with the left knee and the supermarket fall. This item will be amended to the sum of $9,615.43.
Finally, the record does not support plaintiff’s claim for damages for frivolous appeal.
Accordingly, the judgment will be amended to include the following items of recovery:
Special Medicals $ 9,615.43
Loss of Earnings and Diminution of Earning Capacity 40,000.00
General Damages 70,000.00
TOTAL $119,615.43
The judgment in favor of plaintiff appealed from is affirmed but amended to the sum of $119,615.43 with legal interest from date of judicial demand until paid and all costs of the proceedings.
AMENDED AND AFFIRMED.